HARRY WIXSON, GUARDIAN, APPELLEE, v. NEBRASKA CON-
FERENCE ASSOCIATION OF SEVENTH DAY ADVENTISTS,
APPELLANT.

FILED MARCH 17, 1932. No. 27998.

*John J. Ledwith,* for appellant.

*Sterling F. Mutz* and *Edward C. Fisher, contra.*

Heard before ROSE, GOOD, DAY and PAINE, JJ., and
LESLIE, District Judge.

LESLIE, District Judge.

This is an action brought by Harry Wixson, guardian
of the person and estate of Amy E. Wixson, incompetent,
against Nebraska Conference. Association of Seventh Day
Adventists.

Briefly, it is alleged in the petition that the ward had
on the 10th day of July, 1928, certain building and loan
stock of the value of $3,000, which the defendant, Ne-
braska Conference Association of the Seventh Day Ad-
ventists, induced her to assign to it without consideration.
The plaintiff claims that this $3,000 represented practi-
cally all of the ward's estate; that she was at the time

mentally incompetent to manage her business affairs, and was persuaded by undue influence on the part of the defendant and its representatives to assign and transfer the certificate of stock, representing $3,000, to said association. The defendant by its answer admits that it received the certificate in controversy, but denies that Mrs. Wixson was incompetent to enter into the contract, or that undue influence was brought to bear upon her by the association, or any of its representatives, to induce her to turn the stock over to it. The cause was tried to a jury on these issues, and a verdict returned for the plaintiff. Motion for a new trial was overruled by the trial court, and the defendant has brought the case here on appeal.

A brief statement of facts will suffice. The plaintiff's ward, Amy E. Wixson, was at the time of the transaction involved 79 years of age, a widow, the mother of several children, a grandmother, a devout member of the Seventh Day Adventists church, and possessed of $3,000 in the Nebraska Central Building & Loan Association of Lincoln, and perhaps $500 worth of other property.

The contract, by which conveyance was made, was prepared at the office of the defendant association at Grand Island; one of its officers submitted it to Mrs. Wixson for execution before defendant's counsel at Lincoln, and subsequently she was escorted by the same officer of the defendant association to the building and loan association, where formal transfer was made of the stock to the defendant by Mrs. Wixson.

The record of the evidence is voluminous, but it is unnecessary to quote from it, since it is ample to sustain the verdict, assuming that the issues were submitted to the jury under proper instructions. We shall, therefore, consider the assignments of error in relation to instructions. The first of these relates to instruction No. 8 given by the court. This instruction is as follows:

"Where a person who is mentally infirm from old age and feeble of mind or diseased, and because of such condition may be easily persuaded, deals with another in

whom she reposes special trust, confidence or dependence either for advice or spiritual guidance, under circumstances which suggest an unfair advantage, undue influence or fraud, and without consideration, makes a voluntary gift or conveyance of all or nearly all of her property in an unnatural or improvident manner and without independent or disinterested advice, the law presumes that such gift or conveyance was obtained by undue influence, and the burden is upon the donee or person receiving the gift to prove by a preponderance of the evidence that the gift was fairly obtained and without undue influence and that it was the free and voluntary act of the giver. Therefore, if you find from the evidence that the plaintiff's ward, Amy E. Wixson, was old and mentally weak or so enfeebled by age or disease as to be readily susceptible of easy persuasion, and that she had placed trust, confidence or dependence in and upon the defendant conference or its agents, officers or ministers, and that the gift, as claimed by the defendant, represented all or nearly all of the property of the ward and was so improvident and ill-advised on her part as to leave her without means of support in her old age, and that the gift was made without independent or disinterested advice, and that the gift was an unnatural disposition of her property as ignoring the rights of her family, then you are instructed that the defendant must prove by a preponderance of the evidence that the transaction was voluntary, open and fair, and that there was no fraud, imposition or undue means, and that the ward understood the nature and the consequence of her act and that it was not done through the undue influence of the defendant or its agents."

The defendant's contention is that this instruction does not properly state the law, that it places the burden upon the defendant to prove that there was no undue influence, and contradicts instruction No. 2, which assumes to place the burden of proving undue influence and mental incapacity upon the plaintiff. Instruction No. 2 is as follows:

"You are instructed that in this case the burden is upon the plaintiff to prove by a preponderance of the evidence that the defendant, some of its officers, ministers or agents acting for and on behalf of the defendant, by some act or persuasion, or because of some special trust or confidence which Mrs. Amy E. Wixson imposed in such person, unduly influenced her to make the transfer or assignment in question."

Instruction No. 8 merely says, in substance, that if the jury find from the evidence that Mrs. Wixson was mentally so enfeebled by age or disease as to be easily susceptible of persuasion, and that she had placed trust or dependence in the defendant, and without consideration made a conveyance of nearly all of her property to the defendant without independent or disinterested advice, the law presumes that such conveyance was obtained by undue influence, and the burden is then upon the donee to rebut the presumption. We think this instruction correctly states the law.

In *Gibson v. Hammang*, 63 Neb. 349, the court held:

"Where a conveyance from a parent to one of several children * * * is not a just or reasonable disposition of the parent's property, and the age and physical condition of the parent, the proportion of the property conveyed to the whole estate, and the circumstances surrounding the gift suggest * * * undue influence, * * * the burden is upon the donee to overcome the presumption of fact arising from such circumstances."

In *In re Estate of Noren*, 119 Neb. 653, the court again held:

"It may be stated generally that, where a testator who is aged and infirm, with his mental faculties impaired, makes a will * * * in favor of a confidential adviser who is actively concerned in the execution thereof, and who receives * * * valuable property or rights under the will, there arises a presumption of undue influence, and * * * it devolves upon the beneficiary to overcome the presumption * * * by competent evidence sufficient for the purpose."

The rule announced in the foregoing cases has been consistently adhered to by the courts of this state and a majority of the other states. In some states it is held that, where a person of extreme age donates property to one in whom the donor has trust and confidence, lack of independent advice alone is sufficient to cast the burden upon the donee to prove that undue influence was not exerted to induce the donor to make the donation.

It is not necessary to discuss other assignments of error, as they relate largely to the refusal of the court to give certain instructions tendered by the defendant, and we are of the opinion that the instructions given by the court were sufficient.

Finding no reversible error, the judgment of the trial court is

AFFIRMED.

PAINE, J., dissenting.

I am entirely unable, after a careful study of the bill of exceptions and the briefs, to agree with the opinion adopted in this case. The facts as shown by the evidence disclose that Mrs. Wixson, a woman about 80 years of age, attended Adventist camp meetings for many summers; that at the Shelton meeting held in 1926 or 1927 she met two old ladies who told her that each of them had purchased annuities of the Nebraska Adventist organization, one in the amount of $2,000, and the other for $2,900. She thought this matter over for several years, but did not consult her children. It is proved beyond question that no minister, or officer of the organization, ever talked to her about this matter, or solicited this annuity, directly or indirectly, until she approached the president of the organization, Rev. S. G. Haughey, who signed all such documents. His testimony is that, at the close of a service in the Adventist camp meeting, held in Epworth Park, Lincoln, in August, 1928, as he was walking directly from the pavilion to his tent, Mrs. Wixson came up to him. "Q. Now, tell the jury what talk you had with Mrs. Wixson at that time. A. After pass-

ing the time of day and stating she was enjoying the meetings she said that she had a little business and mentioned the fact she had some money and wanted to know if the Conference didn't have provision to take it and allow an annual income from it; that was the way she approached me." In this conversation he told her the details of such an investment, and that they would pay 5 per cent. interest on an annuity, and she told him that was what she wanted. When he returned to his office in Grand Island, he had the same form of annuity contract drawn up that had already been used in some $30,000 of annuities in force in the state, and he returned to Lincoln upon September 10, 1928, with the treasurer, Rev. Marshall, and with Rev. Emery they took Mrs. Wixson to the office of Clarence G. Miles, an attorney, and handed the instrument to Mr. Miles, who did most of the talking with her, and testified as follows: "Q. Do you recall what you said in explaining the instrument to her? A. * * * My best recollection is that I explained to her or asked her if she knew she would never get this money back, that this was an annuity and she would only get the interest on it, and she said yes, she did. She said yes, she understood that. I asked her if she knew that at her death it would not go to her estate or her heirs but would be retained by this association which I see on this paper was the Nebraska Conference Association. I would not remember the exact name. I asked her if she knew that would be retained by the association at her death. She said, 'Yes; I am glad to make this gift.' She said, 'I have been thinking about it for some time.' " And his next answer is: "I then asked if she realized the full import of this and was satisfied to do this. She says, 'Yes; I am, I am glad to do it and it is not anybody's business.' " She then signed and acknowledged the annuity contract and it was signed by the two officers of the association, and on that contract she was regularly paid her 5 per cent. interest in semiannual payments. She did not tell her children of this for some months.

The evidence of Mr. Miles, an attorney and notary, is clear and convincing. In the case of *Little v. Curson*, 114 Neb. 752, it is said in the third paragraph of the syllabus: "The evidence of the attorney who prepared the deed, of the notary who took the acknowledgment, and of the witnesses to the execution of the deed, alleged to have been obtained by undue influence exerted by the grantee, that the deed was executed by the grantor understandingly and voluntarily, cannot ordinarily be overcome by evidence relating to different occasions."

The children of Mrs. Wixson charge that their mother was incompetent and that undue influence was practiced upon her by this church organization, but no proof thereof is submitted by them. Her son Harry, who is her guardian, testified that she told him she transferred it to the association because they paid her 1 per cent. more interest than the bank would pay her, and added that "banks went busted," but that "God was back of the Conference." He further testified that his mother did not approve of the children trying to get the money back from the church. Her son Silas also testified that she was incompetent, and that he had borrowed $300 of her so nobody else would get it, but admitted that she took a mortgage back on his threshing machine for security for the loan to him. To prove her incompetence, her children testified that she lived miserly, nearly starved herself, that she saved milk tops, old cans, and used bread wrappers for napkins, and insisted on wearing old, ragged and patched garments, and lived in a little three-room hut with her oldest son, a rheumatic cripple. No one testified to her incompetency except her own children, who may share the money after her death if it is recovered, and who have now placed her under guardianship. Against this evidence we find that of men who are not personally interested in the outcome of the case. H. F. Bauman, a coal dealer and neighbor, had had many deals with her, and was of the opinion that she was entirely competent. W. H. Crouse, another neighbor, considered her rational

in all her business dealings. George Adams, a leading attorney of Lincoln, to whom Mrs. Wixson went for advice in July, 1930, testified that she was, in his opinion, entirely competent. W. M. Folsom, of the Nebraska Central Building & Loan Association, testified to the same effect.

It is claimed that she parted with her money without consideration, yet the purchase of annuities is the most popular form of investment for old people in England, and many in this country regret not having purchased annuities. Upon what basis can this court declare that the purchase of a safe annuity, with a legal contract binding a large state-wide church organization, is entirely without consideration?

Upon this state of facts, the trial court gave instruction No. 2, set out in the opinion, in which it was rightly stated that the burden of proof of undue influence was upon the plaintiff alleging it, and in No. 6 the jury were told that there must be proof that the assignment was obtained by undue influence. *Latham v. Schaal,* 25 Neb. 535; *Seebrock v. Fedawa,* 30 Neb. 424. Commissioner Pound said, in *Boggs v. Boggs,* 62 Neb. 274: "Undue influence, in order to invalidate a will, must be of such character as to destroy the free agency of the testator and substitute another person's will for his own." And Judge Day said, *In re Estate of Bayer,* 119 Neb. 191, that, in such a case, suspicion or supposition of undue influence is not sufficient either to require the submission of the question to the jury or to sustain a verdict. Now, departing from the line of these decisions, the trial court, in instruction No. 8, set out in the opinion, in my judgment confused the jury by changing the burden of proof, under certain conditions not found in the evidence in this case, and instructed the jury that the burden shifts and requires the person receiving the gift to prove by a preponderance of the evidence that it was obtained without undue influence. The jury from this instruction would conclude that the judge considered that all of the requisite

conditions existed in this case, or the instruction would not have been given. The evidence in no way warranted the giving of instruction No. 8, and in my opinion this constituted reversible error.

If a determined old lady, who knows her own mind and without consulting her children, carries out her own wishes in that regard and buys an annuity contract, can have her wishes held for naught and the contract set aside upon evidence such as offered in this case, then no such annuity can stand in this state against such attacks. The entire evidence discloses that the conduct of the officers of this church organization was above reproach, for, even after she sought them out and asked for the investment, they did not press the matter, but gave her every opportunity to seek other advice and change her desires.

It is a matter of common knowledge that colleges, hospitals, homes for the aged, universities, ministerial benefit funds, missionary societies, American Bible Society, and many forms of individual church organizations, all seek to pledge payment of annuities on funds placed with them on practically the same form of contract as used in this case. If this decision becomes the law of Nebraska, it will be useless for such organizations to seek such deposits without securing the consent of all of the prospective heirs of the annuitant.